ARNOLD H. BREIN *vs.* THE CONNECTICUT ECLECTIC
EXAMINING BOARD ET AL.

Third Judicial District, New Haven, June Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and NICKERSON, JS.

The issuance of a certificate to practice the profession of medicine
and surgery confers upon its possessor a special and valuable
privilege, of which he cannot be deprived without due notice and
full opportunity to be heard.

In this State, such certificates are issued by the Department of Health
without independent investigation and solely upon the recom-
mendation of the examining board or committee of the par-
ticular school or branch of the healing art to which the appli-
cant seeks admission. This system places upon such committees,
which do not possess the same measure of statutory authority
enjoyed by those entrusted with the supervision of attorneys
at law, a heavy burden of responsibility and sheds a strong light
upon the public policy which underlies the statutes dealing
with the suspension and revocation of the right to practice.

In the present case, the plaintiff procured his certificate by making
to the Connecticut Eclectic Examining Board fraudulent repre-
sentations concerning his preliminary and professional educa-
tion. When this fraud became known, the Eclectic Board,
acting under General Statutes, § 2859, made written request to
the Department of Health for the revocation of the certificate
thus issued; and this was immediately done without notice
being given or hearing afforded to the plaintiff, who thereupon
appealed to the Superior Court under § 2860, which conducted a
full inquiry *de novo* into all the facts, found that the plaintiff
had secured his license by fraud, and dismissed the appeal.
*Held:*

1. That § 2859 could not be construed to require either the Ex-
amining Board or the Department of Health to give any notice
or hold any hearing prior to the revocation of the certificate.

2. That the statutory provision for an appeal to the Superior Court
and a full hearing before final judgment—the acts of the Ex-
amining Board and the Department of Health being merely
administrative and not in the nature of a judgment—satisfies the
constitutional requirement of due process of law.

3. That imminent danger to the public health in permitting un-
qualified persons, such as the plaintiff, to continue in active
practice pending a protracted trial of issues of fact, abundantly

justified the General Assembly in postponing the hearing until after the provisional revocation of the certificate.

4. That the statutory appeal to the Superior Court and the trial there *de novo* of the issues of fact, does not violate the constitutional principle that the General Assembly cannot authorize the courts to perform functions which are clearly administrative, since the Superior Court, upon such an appeal, does not attempt to exercise the administrative power of revoking certificates, but merely makes a necessary inquiry into the facts for the purpose of properly discharging its legitimate judicial function of determining whether the administrative bodies, from which the appeal is taken, have acted illegally or have exceeded their limited jurisdiction.

5. That, under the rule that all bodies charged with the performance of public duties continue to function though a vacancy in their membership exists, the written request by the four surviving members (the fifth having died) of the Examining Board to the Department of Health praying the revocation of the plaintiff's certificate was equivalent to "the written request of all the members" required by the statute.

Argued June 11th—decided July 30th, 1925.

PETITION to review the action of the Connecticut Eclectic Examining Board and the State Board of Health in revoking the plaintiff's license to practice the profession of medicine in this State, taken to the Superior Court in Fairfield County and referred to *Hon. Marcus H. Holcomb,* State Referee, who heard the parties and reported the facts; the court, *Avery, J.,* accepted the report and rendered judgment dismissing the petition, from which the plaintiff appealed. *No error.*

This petition, together with four others substantially alike, was referred by stipulation to *Hon. Marcus H. Holcomb,* State Referee. All were heard together, and one report, containing the facts pertinent to all the cases, was filed. Each petition alleges that the petitioner satisfactorily passed the examinations set by the eclectic examining board on a date named, and received a certificate to that effect, and that the board

of health thereafter issued to the petitioner a license to practice medicine in this State in the form of a certificate of registration; that on a date named the eclectic examining board thereafter requested the state board of health to revoke the petitioner's certificate, and that board did revoke the same and notified the petitioner to that effect. It is also alleged that the eclectic examining board voted to request the board of health to revoke the petitioner's certificate without giving him any notice, hearing, or opportunity to be heard. The foregoing states the substance of paragraphs one, two, three, four, five, six, eight and ten of the petition, all of which paragraphs are admitted by the respondents and found to be true.

It is further alleged, and denied by the respondents, that no evidence was presented to the eclectic examining board upon which its request for the revocation of the petitioner's certificate was based; that petitioner was deprived of his constitutional rights by the eclectic board's failure to give him notice of the charges against him, and by proceeding in his absence and without hearing to request the board of health to revoke his certificate; that upon the facts alleged as to absence of evidence, any finding by the eclectic board that the petitioner had procured his certificate by fraud was void, and furnished no basis for the revocation of the certificate by the board of health; that the written request to the board of health was not signed by all the members of the eclectic board, as required by § 2859 of the General Statutes; and that the petitioner did not procure his certificate of registration by fraud. On these allegations and denials the issues are found for the respondents. The petition concludes by alleging that the petitioner is aggrieved by the action of the eclectic examining board and the state board of health, and by praying that the Superior

Court inquire into the truth of the matters alleged and order that the petitioner's certificate of registration be returned and restored, etc.

The referee's report, after finding that the admitted allegations of the several petitions are true, proceeds as follows:

"4. The licenses of said petitioners to practice medicine in this State were revoked by the Commissioner of Health because so requested in three letters dated respectively, November 28, 1923, December 6, 1923, and January 10, 1924, each letter containing a list of persons whose licenses were to be revoked and included these petitioners; said letters were signed by the four members of the Connecticut Eclectic Medical Examining Board, a vacancy caused by the death of the fifth member not then having been filled.

"5. Said letters were laid in evidence at said hearing and were marked 'Defendants' Exhibits B, C, and D,' Exhibit D containing a copy of a letter from Hugh M. Alcorn, State's Attorney for Hartford County, requesting said action. He made a similar request in said letters to said Board containing other lists.

"6. The members of said Examining Board had previously met said State's Attorney at the County Court House in Hartford, and been informed by him that the Grand Jury had evidence that the men named in said lists had been guilty of fraud in obtaining their licenses, and that he expected said Board to promptly take the necessary action to have said licenses revoked.

"7. Said requests by said Board to the Commissioner of Health were made because of said request to said State's Attorney, and not upon any investigation of finding of fraud made by the said Eclectic Medical Examining Board.

"8. The applications of said petitioners were made to said Eclectic Medical Examining Board, and said

Board examined and passed them, and said petitioners received from the State Department of Health a certificate of registration stating that they were qualified to practice medicine in this State.

"9. Said petitioners did not present to said Medical Examining Board a certificate of good moral character signed by two reputable citizens of this State, but the certificates of good moral character which they did file were signed by two persons who were not residents of this State, except that filed by Gerald Richardson which was signed only by D. R. Alexander, who is a resident of Kansas City, Missouri.

"10. Neither of said petitioners presented to said Examining Board evidence that before beginning the study of medicine he completed at least nine months' course of study which included chemistry, physics and general biology.

"11. Said Examining Board made no investigation to determine the truth of the statements made by the petitioners in their applications as to having had a high school education, or its equivalent, or as to their medical education, but assumed all such statements to be true because sworn to by the applicant.

"12. Said Examining Board made no investigation to determine what school of medicine or practice was taught in the medical college or school from which the applicant graduated or received his diploma.

"13. The St. Louis College of Physicians and Surgeons belonged to the regular or Allopathic School of Medicine, and was so known to the secretary of said Examining Board and he so testified at said hearing. The majority of said petitioners claimed to be graduates of that college.

"14. Said Examining Board never filed with the Commissioner of Health until the Spring of 1923, a

list of medical colleges or institutions recommended as legal and reputable by its society.

"15. Dr. Frederick W. Waite, of Cleveland, Ohio, a professor in the Medical School of the Western Reserve University of Ohio, in 1923, was requested by the Governor of Missouri, to assist as an expert on medical education, the State Board of Missouri, in investigating the medical schools of that State.

"16. Said committee investigated the St. Louis College of Physicians and Surgeons, of which college Dr. Waldo Briggs is the dean and manager. A copy of the report made by said committee of their examination of this college was laid in evidence and is marked 'State's Exhibit 9.'

"17. This college claims to require a four years' course for graduation, but in fact frequently graduates its students after two years' attendance, and about eighty per cent of its graduates attended its school one year or less, coming there from other medical schools. It appears to have been the harbor for derelicts from the weakest medical schools in the country. In forty-two of the United States its graduates are not recognized by the Medical Examining Boards as graduates of a reputable school of medicine. It claims to belong to the regular or allopath school of medicine.

"18. Said committee investigated the Kansas City College of Medicine and Surgery, of which college Dr. Date R. Alexander is the secretary and active manager. A copy of the report of said examination made by said committee was laid in evidence and marked 'State's Exhibit 8.' Said committee had difficulty in examining the records of this college. Dr. Alexander said the records were in the custody of the prosecuting attorney of the county.

"19. The graduates of this college are not recognized by the medical examining boards of forty-one of the

United States. Its salaried force are paid no more than $2,000 in the aggregate and Dr. Alexander told Dr. Waite that he knew his school amounted to nothing, but that the honorary degree was what he was interested in, and said 'I will keep my school going if I have only one student and have to pay him to stay here,' as that would exempt his property from taxation, and as long as he kept one student there he could continue to give honorary degrees, and that was his chief business. He said that two of the Connecticut Eclectic Board were his graduates, and said that in 1923 out of a total of sixty of his graduates, twenty-three were in practice in Connecticut, and others had reciprocated from Connecticut to Kansas, Arkansas and Nebraska that he knew of and there might be others.

"20. Said committee investigated the Kansas City University of Physicians and Surgeons, made a report thereon, a copy thereof being laid in evidence, and marked 'State's Exhibit 10.'

"21. The dean and owner of this school is Dr. A. L. Mckenzie who is a graduate of the school, which was chartered in 1903 as the Central College of Osteopathy. Its charter was amended in 1907 authorizing the granting of degrees of medicine, and the name was changed to Central College Medical Department and its present title was taken in 1918. Dr. Waite stated that reasonably authentic reports are that its medical degrees are not recognized in forty-six of the United States. The teaching is largely done by students who are paid no salaries but get a scholarship for teaching. Dr. Mckenzie stated that he had great difficulty in getting teachers because the local reputation of the school is such that members of the medical profession are told by their friends that any connection with the school will be detrimental.

"22. Dr. Nathan P. Colwell, of Chicago, Illinois, who since December, 1895, has been secretary of the Council of Education in hospitals of the American Medical Association, and the executive officer of the committee to investigate and improve the standard of medical education in the United States, testified at said hearing as to the action taken by said committee.

"23. Said committee divided the medical schools of the United States into three classes, A, B, and C, depending upon the percentage shown in said investigations; Class A colleges being those which obtained a percentage between 70 and 100; Class B colleges being those obtaining a percentage between 50 and 70, and Class C colleges being those having a percentage less than 50, and which needed a complete reorganization to become acceptable.

"24. Said committee examined the St. Louis College of Physicians and Surgeons in 1907 and rated it in Class B, but on the second examination in 1909 rated it in Class C, because the school had deteriorated in facilities and equipment. The committee examined it again in 1918 and did not change the rating.

"25. Said committee examined the Middlesex College of Physicians and Surgeons and the Boston College of Physicians and Surgeons, and rated each of them in Class C.

"26. Said committee called at the Kansas City College of Physicians and Surgeons and were refused admittance by Dr. Date R. Alexander, the dean of said college, who told them he would prefer to remain unclassified than be rated in Class C. He was asked what school of medicine his school taught and said he called it eclectic so that his graduates might be accepted by the eclectic examining boards of Arkansas, Florida, Georgia and Connecticut.

"27. Dr. Colwell testified at said hearing, and the above recited facts are predicated upon his testimony.

"28. William P. Sachs of St. Louis testified at said hearing and said that he had been connected with the Department of Education of the State of Missouri with authority to examine applicants for examination for a certificate equivalent to a high school certificate, and as the agent of said department to give said applicants who passed such examination with a percentage of 70 or better, such certificate. He signed said certificates 'W. P. Sachs, Official Examiner for the State Superintendent.' Several of these certificates were received in evidence, one in name of George Maud Sutcliffe—State's Exhibit 10-c; and one marked 'State Ex. 20'; one in the name of Harry Thompson, 'State's Exhibit 11'; one in name of Harry Chaimson marked 'State's Exhibit 32'; one in name of Ralph L. White marked 'State's Exhibit 33'; one in name of Morris Burstan, marked 'State's Exhibit 34'; one in name of Rueben Adcox marked 'State's Exhibit 35,' and one in name of James A. Christian marked 'State's Exhibit 36.'

"29. He said no applicant appeared before him to take an examination for these certificates during the years 1919-1920-1921-1922-and 1923, and that all such certificates issued during that period were fraudulent. That he issued said certificates at the solicitation of Dr. Adcox of St. Louis who paid him $10 for each certificate, and that Dr. Adcox received $50 for the certificates, and that he had issued hundreds of said certificates each year, approximating 1500 of them; and that Dr. Adcox and Dr. Voigt were in collusion with him regarding said certificates; that he did not know what certificates reached the persons named in them. Said Sachs testified that Dr. Adcox said Ralph

L. White was a big man in Connecticut on the State Board of Health.

"30. George Maud Sutcliffe was a witness at said hearing and testified that in July, 1918, he matriculated in the St. Louis College of Physicians and Surgeons, and paid Dr. Waldo Briggs, dean of the college, $5 therefor. That said Briggs said he would have Sachs fix up his credits, and that Sachs came to him and said it would cost $25 and he fixed up said credits without any examination. Sutcliffe entered the Freshman class in 1918, and was made registrar of the college and was registrar for two years. At the end of the Freshman year Dr. Briggs said he could go into the third year, the Junior year, at the end of which year said Sutcliffe was graduated and received his diploma; the dean and the secretary signed the diplomas; said Sutcliffe was going to Colorado to take the examination there, and before going he saw the dean with reference to getting into Missouri, and Briggs said 'Well, in order to make sure that you get into Missouri, I will issue a diploma for 1918.' At that time the Missouri Medical Examining Board would not accept a graduate of the St. Louis College of Physicians and Surgeons after 1918, and he issued another diploma to said Sutcliffe, signed by the secretary and himself, the date of which was about a month before said Sutcliffe ever saw the college. Said Sutcliffe went to Colorado and took and passed the State examination on his 1918 diploma, and by reciprocity received a license to practice in Connecticut.

"31. Dr. Joseph H. Stintzel, of St. Louis, testified at said hearing as follows: 'I am a graduate of the St. Louis College of Physicians and Surgeons. I was registrar of the college in 1922 and registrar and secretary in 1921 and 1922, and am now secretary. William P. Sachs furnished about seventy-five pre-

liminary certificates for students entering some class in St. Louis College of Physicians and Surgeons during the two years I was secretary. I refused to sign twenty diplomas which were put in front of me to sign in 1923, because I had never seen the men named in the diplomas. About four fifths of our graduates came to us from other colleges.

"32. Harry Thompson Brundidge, a reporter on the St. Louis Star, was assigned to investigate the rumors that medical students were being granted diplomas without earning them. He dropped the name of Brundidge and started to make the acquaintance of Dr. Adcox and Dr. Voigt, assuming the name of Harry Thompson, and the occupation of a coal salesman. After getting intimate with Dr. Adcox he told him he would like to be a doctor but hadn't the time to give to become one. Dr. Adcox took him to see Dr. Voigt, and they informed him that he could become a doctor without taking the time if he had the money to pay for it, but it would cost him $1,500 or more, depending upon the State he wished to practice in. He told them to go ahead, that he would pay for it. He commenced said investigation in August, 1923, and in October, 1923, he had obtained from said Adcox and Voigt the preliminary education certificate of Sachs, marked 'State's Exhibit 11,' the diploma as Doctor of Medicine, purporting to be given by the National University of Arts and Sciences, being 'State's Exhibit 12,' and a diploma purporting to be issued by the Progressive College of Chiropractic, of Chicago, Illinois, and laid in evidence as 'State's Exhibit 12½,' and had paid said Adcox and Voigt more than $1,000 therefor.

"33. Said St. Louis Star concluding they had sufficient evidence for their purpose, published an account of said investigation (see Defendants' Ex-

hibit F), and pursuant to arrangement which had been made with the prosecuting officials of St. Louis and Kansas City, the house and offices of Drs. Adcox and Voigt and Saxe were raided and considerable material was found and taken. At the house of said William H. Sachs were taken 'State's Exhibits 32, 33, 34, 35 and 10-E,' and from the house or office of Dr. Adcox were taken 'State's Exhibits marked 36-A, 37, 38, 39, 40, 41, 42, 43, 44, 45-A, 46, 47, 48, consisting mostly of bank checks which had been paid and returned. Said Brundidge testified as a witness at said hearing to the statements in paragraphs 32 and 33, and I find them to be true.

"34. I find that the St. Louis College of Physicians and Surgeons, through Dr. Waldo Briggs issued many diplomas which they termed addendum degree diplomas to non-graduates of the college for a charge of $225 each, that he continually graduated and granted diplomas to men who had not had more than two years' medical study, and that he received very many of the qualifying education certificates of said William H. Sachs as credits to applicants for admission knowing them to have been fraudulently issued.

"35. I find that Dr. Waldo Briggs, Dr. Date R. Alexander, Dr. Adcox, Dr. Voigt, William H. Sachs and others, were severally and jointly interested in issuing fraudulent graduating and honorary degrees, diplomas and certificates for personal profit.

"36. The St. Louis College of Physicians and the Kansas City College of Medicine and Surgery are legally incorporated institutions, as appears by copies of their acts of incorporation placed in evidence and marked State's Exhibit 10-A and 10-B, but said institutions are not reputable medical colleges.

"37. Dr. Ralph L. White, a member of the Connecticut Board of Eclectic Medical Examiners, at the sug-

gestion of a friend, and through him gave Dr. Adcox $1,250 to buy an honorary degree but later, concluding he would prefer the money to the degree, received back from Dr. Adcox $1,150 by his check for said amount payable to Ralph Lewis White, which check was laid in evidence and marked 'State's Exhibit 36-A,' Dr. Adcox retaining the other $100 for his services and expenses.

"38. The application of said petitioner Isidor Yockelman, laid in evidence and marked 'State's Exhibit 50,' states that he graduated at St. Louis College of Physicians and Surgeons June 2, 1920, and his statement, laid in evidence as 'State's Exhibit 1,' states that his Freshman year was at the College of Physicians and Surgeons, Boston, but he does not state what medical school he attended, if any, during his Sophomore and Junior years, but states that the Senior year 1919-1920 was at the St. Louis College of Physicians and Surgeons. That college year commenced in October or November, and ended in June, 1920, and I find upon the uncontradicted testimony of the secretary of that college that said Yockelman did not attend said Senior class before the last of February or the first of March, 1920.

"There was introduced in evidence the copies of two records of convictions of said Yockelman before the Superior Court of the Commonwealth of Massachusetts which were placed in evidence and marked 'State's Exhibits 21 and 22'; the first conviction being for perjury in his application for examination for registration in medicine, and the second conviction being for the unlawful taking and using electricity manufactured and distributed by the Edison Company of Boston.

"39. The application of said petitioner, Harry Chaimson, was laid in evidence and marked 'State's

Exhibit 51,' in which he states he was graduated at St. Louis College of Physicians and Surgeons on May 18, 1921, and in his affidavit introduced in evidence and marked 'State's Exhibit 2,' under the heading 'High School diploma or Equivalent' he states North Eastern Prep. School, Boston, 1916-1917-1918, and under the head 'Medical Education' he states his Freshman year 1916-1917 was at the College of Physicians and Surgeons, Boston, and his Sophomore year 1917-1918 was at the Middlesex College of Medicine and Surgery, thus it appears that during these two years his attendance to obtain his high school education or its equivalent, he was also attending medical colleges to obtain his medical education, which may appear to conflict with the provisions of § 2855 of the General Statutes of Connecticut that before beginning the study of medicine one must show that he was graduated from a high school or preparatory school whose standing shall be approved by said committee, or that his preliminary education is equivalent thereto.

"40. The application of the petitioner Arnold H. Brien was introduced in evidence and marked 'State's Exhibit 49' in which he states he attended the St. Louis College of Physicians and Surgeons during the years 1917 to 1922, graduating at said college June 6, 1922, and that three days later he graduated from Kansas City College of Medicine and Surgery, which apparently must have been an honorary degree. In his sworn affidavit introduced in evidence and marked 'State's Exhibit 3,' said Brien states his Freshman medical year was at the New York Homeopathic Medical College and Flower Hospital, and that the Sophomore, Junior and Senior years were at the St. Louis College of Physicians and Surgeons. Dr. Joseph H. Stintzel, the secretary of St. Louis College of Physicians and Surgeons testified at said hearing that said

Brien only attended said college during the years 1921-1922, and being uncontradicted, I find Dr. Stintzel's statement to be true.

"41. Said petitioner, Gerald A. Richardson, made application for examination in March, 1923, stating in said application that he graduated on October 28, 1922, from the Kansas City College of Physicians and Surgeons, and he states in said application that he had attended the Kansas City University of Physicians and Surgeons four years from 1917 to 1921. His application was placed in evidence as 'State's Exhibit 52,' and is endorsed as to moral character by only one witness—Date R. Alexander of Kansas City, the dean of that college. His application does not show that he ever had a high school education or its equivalent.

"42. The statement of Bernard I. Kafka, was introduced in evidence and marked 'State's Exhibit 4' in which he states he attended in his Freshman year the St. Louis College of Physicians and Surgeons; the Massachusetts University of Medicine and Surgery during the Sophomore and Junior years, and the St. Louis College of Physicians and Surgeons during his Senior year until June 7th, 1922.

"43. The evidence shows that eighteen men graduated from the St. Louis College of Physicians and Surgeons and who received a diploma the same year from the Kansas City College of Medicine and Surgeons upon which they were licensed in this state. It also shows that three men graduated from the Boston College of Physicians and Surgeons, and the same year received a diploma from the Kansas City College of Medicine and Surgery and upon which diploma they were granted their medical license. A graduate of Middlesex College of Boston was granted a medical license in this State under the same circumstances.

"44. Dr. Date R. Alexander, secretary and owner of

the Kansas City College of Medicine and Surgery, came to Connecticut in 1920, and passed the examinations held by the Connecticut Eclectic Medical Examining Board and said Board granted him a license, but he never called for it.

"45. Dr. Robert Adcox of St. Louis took the eclectic medical examination in 1921 and failed. The following year he took it again and passed, but has never claimed his license. The significant fact that appears on his application is that his certificate of moral character is signed by Dr. Waldo Briggs and Dr. Date R. Alexander.

"46. The number of medical licenses granted in this State to graduates of the St. Louis College of Physicians and Surgeons by years are: 1920—1, 1921—34, 1922—6, 1923—9; of the Kansas City College of Medicine and Surgery, 1920—8, 1921—23, 1922—25, 1923—38.

"47. Dr. Alexander stated to the Missouri Investigating Committee and which is part of their report, that the honorary diplomas issued by the Kansas City College of Medicine and Surgery, are identical with the ordinary diploma of the school, except that after the name of the candidate appears the letters 'M. D.' which indicates that he has or is already a graduate in medicine, and that all the fellows that got them had to go to Connecticut first. He said that in July, 1923, of a total of sixty having diplomas issued, twenty-three were in practice in Connecticut.

"48. The members of the Connecticut Eclectic Medical Examining Board testified that all examination papers were collected immediately after the examination, and that nobody ever had access to them except the members of the Board, but in the raid made by the police on the home of Dr. Robert Adcox in St. Louis, fifteen sets of examination questions made

by the Connecticut Eclectic Medical Examining Board for the years 1922 and 1923 were found.

"Dr. Ralph Voigt, so Brundidge testified, told him that he (Voigt) and Adcox and Alexander had an arrangement with the medical board in Connecticut whereby they could get the examination papers in advance.

"49. The record shows that Dr. Date R. Alexander endorsed the moral character of one hundred and twenty medical applications in this State; Robert P. Adcox endorsed the moral character of fifteen, and that Alexander and Adcox in addition to the foregoing jointly endorsed the moral character of twelve applicants.

"50. In the session of the General Assembly of 1923, an act was passed validating the medical licenses of Isidor Yockelman and Harry Chaimson among others named in the bill. The bill was vetoed by the Governor.

"51. It appeared from the evidence at this hearing that the Connecticut Eclectic Medical Examining Board has been the asylum for applicants to practice medicine who have graduated from discredited medical schools, which applications could not be received or considered by the medical examining boards in ninety per cent of the States of the United States.

"52. All of said petitioners were present at said hearing, but neither of them took the witness stand or testified.

"If the court shall find that upon a consideration of the foregoing recited facts said petitioners were guilty of procuring their certificates of registration by fraud, or if either of them has been convicted of a felony, then I recommend that the petition of said petitioners be dismissed."

The Superior Court accepted the report, found therefrom that each of the petitioners, including the

appellant, had procured his certificate of registration by fraud and collusion, and entered judgment dismissing the several petitions.

*John B. Dillon,* for the appellant (plaintiff).

*Frank E. Healy,* Attorney General, for the appellees (defendants).

*Lawrence A. Howard* and *John H. Buckley,* filed a brief as *amici curiæ.*

BEACH, J. Under our law no person, not holding a certificate of registration issued by the State board of health, may practice the profession of medicine and surgery in this State. General Statutes, § 2854. It has been the policy of the General Assembly to leave the examination and approval of applicants for such certificates to committees of the several State medical societies representing different schools of practice, subject to the conditions prescribed in §§ 2855, 2856 and 2857 of the General Statutes; and to authorize the State board of health to issue a certificate of registration upon due notice from one of such examining committees that the applicant has satisfactorily passed the required examination, and is otherwise qualified. No independent investigation of the merits of the applicant is required either by the State board of health or any other State authority. Such a policy throws a heavy burden of responsibility on the examining committees of the several State medical societies, for while some of these societies at least, have their grievance committees for the discipline and possible expulsion of offending members, such committees are not clothed with statutory authority to require the attendance of witnesses, as are the griev-

ance committees of the county bar associations, nor are members of the medical profession officers of the courts and as such directly under their disciplinary jurisdiction, as practicing lawyers are. Perhaps the most fundamentally essential requisite for admission to a profession whose practitioners are necessarily brought into a close fiduciary relation to their patients, is that the applicant should be of good moral character, and no more conclusive evidence of utter unfitness to practice medicine can be imagined, than proof that the applicant has procured by fraud the certificate of registration, which admits him to practice.

It is quite true that the issuance of the certificate confers upon its possessor a special privilege whose value cannot be measured in money alone, and of which he cannot justly be deprived without due notice and full opportunity to be heard.

On the other hand, since the examining committee of each school of medicine is charged by law with the sole responsibility of approving the fitness of applicants to practice according to its tenets, the subsequent unanimous withdrawal of such approval is an act of great significance. And when the reason given for such withdrawal is that the approval of the applicant's fitness by the committee was procured by fraud, the action of the committee is equivalent to an authoritative declaration that its original approval, which is the statutory condition precedent for the issuance of the certificate, was never truly and in reality given; and that the statutory precautions for the public health and welfare have been evaded. The situation thus developed is one so imminently dangerous to the public health and welfare that the General Assembly has authorized the board of health to summarily revoke the certificate. General Statutes, § 2859. But the revocation is provisional and not final, for § 2860

of the General Statutes provides for an appeal to the Superior Court, where the matter may be re-examined *de novo*, "which court may grant the proper relief."

We are unable to perceive that any constitutional rights of this appellant have been violated by this method of procedure. He has elected to appeal from the doings of the State board of health to the Superior Court, where he has had his day in court and has been found guilty of procuring his certificate of registration by fraud. That finding is not attacked on this appeal. Therefore the appellant's claims that he has been deprived of his certificate of registration without notice, hearing, and judgment on the merits, are really limited to a criticism of the order in which the several steps were taken which have resulted in the final adjudication of the Superior Court. His grievance is that he was not given opportunity for a preliminary hearing by the eclectic examining board, before that board requested the board of health to revoke his certificate. In that connection the claim is made that although the statute does not authorize, much less require, that board to give any notice or to hold any preliminary hearing before requesting the board of health to revoke a certificate of registration, such provisions must be read into the statute by construction. We think not. As already pointed out, the eclectic examining board is not equipped with authority to compel the attendance of witnesses, and cannot effectually conduct a legal inquisition. In requesting the board of health to revoke a certificate of registration on the ground that it was procured by fraud, it acts as a sponsor turned accuser; and the statute does not require it to do more. So the State board of health revokes the certificate on the written request of all the members of the board, and in so doing it acts as the authorized agent of the law, whose purpose and

effect is primarily to safeguard the public health and welfare without the delay incidental to a preliminary hearing, and secondarily, to enable the issue of fact, if any, to be brought to the speediest possible determination in a court having final jurisdiction over issues of fact. We are of opinion that the procedure followed in this case was in strict accord with our statutes, and in that particular the appellant has not been deprived of due process of law.

The remaining question is whether the statutory procedure is so inherently unreasonable or inappropriate to the end in view as to involve the deprivation of some constitutionally guaranteed right. As to the right to a hearing the accepted rule is that one hearing before judgment, if conducted in accordance with the fundamentals of judicial procedure, satisfies the constitutional requirement. *Manners* v. *Waterbury,* 86 Conn. 573, 578, 86 Atl. 14; *Thomson* v. *New Haven,* 100 Conn. 604, 606, 124 Atl. 247; *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Backus,* 154 U. S. 421, 14 Sup. Ct. 1114; *King* v. *Portland,* 184 U. S. 61, 22 Sup. Ct. 290; *Southern Ry. Co.* v. *Durham,* 266 U. S. 178, 45 Sup. Ct. 51.

Neither the eclectic examining board nor the State board of health had power to render a judgment. Their acts were administrative, resembling, though not having the finality of, the destruction of peach trees infected with the "yellows." *State* v. *Main,* 69 Conn. 123, 137, 37 Atl. 80.

The receipt of the notice of revocation by the board of health conferred an immediate right of appeal, which being pursued gave the appellant the hearing before judgment to which he was entitled. Indeed, it is enough that it gave him the opportunity to be heard. *Reetz* v. *Michigan,* 188 U. S. 505, 509, 23 Sup. Ct. 390.

In this connection we note that while the appel-

lant's petition to the Superior Court alleges the receipt of a notice that his certificate of registration had been revoked and to return such certificate to the office of the State department of health, it is nowhere distinctly alleged that the appellant was in fact deprived of the privilege of practicing medicine pending the determination of his appeal to the Superior Court; and upon the argument before us it was stated as a fact by counsel for the appellant that he had been permitted to continue the practice of medicine notwithstanding the receipt of such notices. That being so, it seems that he was not even temporarily deprived of the special privilege of practicing medicine until the judgment of the Superior Court. But if he has been deprived temporarily of that privilege without notice and hearing pending the determination by the Superior Court of his appeal, we are of opinion that the public interest involved and the nature of the charge against him fully justified the procedure authorized by the statutes. No better demonstration that these statutes are a reasonable exercise of the police power over the subject-matter, and no clearer proof that they are appropriate to the end in view is needed, than to read the undisputed findings of the State Referee printed in the statement of facts.

The foregoing covers all the reasons of appeal except the second, which alleges that the court erred in ruling that the petitioner's certificate of registration was revoked by the State board of health, "upon the written request of all the members of" the eclectic examining board, as required by § 2859 of the General Statutes.

The finding on this point is that the request was signed by four members of the board, a vacancy caused by the death of the fifth member not then having been filled.

This assignment of error is not well taken. The board, being charged with legal duties and responsibilities, must continue to exist and function though a temporary vacancy occurs. It was the duty of the president of the Connecticut Eclectic Medical Society to nominate a person to fill the vacancy in question. General Statutes, § 2856. Obviously, his neglect to do so, cannot nullify the operation of § 2859. The rule is that all bodies charged with the performance of public duties continue to function though a vacancy exists.

The brief filed by the *amici curiœ* takes as its premises the constitutional independence of the executive, legislative and judicial departments, and the fact that the issuing or revoking of physicans' licenses belongs to the executive department; and reaches the conclusion that the Superior Court cannot try a case of revocation *de novo,* because that would be in effect assuming the executive duty of revoking a license. This we think is a *non sequitur.*

It is true that "where the action of an administrative body involves only a purely administrative matter, the court, on a statutory appeal from such a body, has before it only the question, if properly raised, whether the body has acted illegally or has exceeded or abused its powers." *Modeste* v. *Public Utilities Commission,* 97 Conn. 453, 459, 117 Atl. 494.

But in determining whether such a body has acted illegally the court must of course have jurisdiction to determine the issues of fact necessarily involved. The Superior Court did not undertake to try a case of revocation *de novo.* It has not assumed to revoke appellant's license, but merely to inquire *de novo* into the alleged fact that the appellant procured his license by fraud; and upon finding that issue in the affirmative, to adjudge that the eclectic examining board and State

board of health did not act illegally or exceed their limited jurisdiction, in revoking appellant's license.

There is no error.

In this opinion the other judges concurred.